**In re Zubeida KHAN.**

**In re McKinley HAMBLIN.**

**Bankruptcy Nos. 3–93–6058, 3–94–90.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Sept. 20, 1994.

Dale C. Nathan, Eagan, MN, for debtor Zubeida Khan.

Matthew R. Burton, Minneapolis, MN, for Bank of Montreal.

Richard J. Pearson, New Brighton, MN, for debtor McKinley Hamblin.

Thomas L. Garrity, Minneapolis, MN, for Transp. Ins. Co.

## ORDER DENYING MOTIONS FOR DISMISSAL OF CHAPTER 7 CASES

GREGORY F. KISHEL, Bankruptcy Judge.

These Chapter 7 cases are before the Court on motions of creditors for dismissal pursuant to 11 U.S.C. § 707(a).

*In re Zubeida Khan,* BKY 93–36058, the Court convened an evidentiary hearing on the motion of the Bank of Montreal ("the Bank") on April 21, 1994. The Bank appeared by its attorney, Matthew R. Burton; Debtor Zubeida Khan appeared personally and by her attorney, Dale C. Nathan.

*In re McKinley Hamblin,* BKY 94–30090, the Court convened a hearing on the motion of Transportation Insurance Company ("TIC") on April 26, 1994. TIC appeared by its attorney, Thomas L. Garrity; Debtor McKinley Hamblin appeared by his attorney, Richard J. Pearson; and the United States Trustee appeared by his attorney, Andrew J. Schmid.

Upon the evidentiary record made for both cases, the briefs and arguments presented by counsel, and all of the other files and records in these cases, the Court makes the following consolidated memorandum order in disposition of the issues presented.

### FINDINGS OF FACT

#### I. *In re Khan*

Debtor Zubeida Khan filed a voluntary petition for relief under Chapter 7 on Decem-

ber 29, 1993. She is a medical doctor and is presently licensed to practice in the states of Minnesota and Florida. A native of Pakistan, she came to the United States in the mid–1980s to do post-graduate study in Texas. She is presently of the age of 40, as is her husband, Akbar Esker. They have two children, one 18 years old and the other 7 years old.

From 1988 until 1991, Khan was engaged in the private practice of medicine in Sydney, Nova Scotia, Canada, owning and operating her own clinic. She and her husband owned a home there. They also set up a business corporation, A to Z Holdings Ltd. ("A to Z"), to purchase, renovate, and maintain a commercial building. Khan's clinic operated in a portion of the building, and A to Z rented out the remainder to other tenants. The Bank furnished financing to Khan and her husband for the purchase of the home and for the final remodeling of the commercial building. As security for the former loan, it took a mortgage against the home.[1]

After Khan had spent several years in Sydney, several factors prompted her to seek employment prospects elsewhere: a persisting recession in the Canadian national economy, a decline in the local mining and fishing industries, a corresponding decrease in the volume and profitability of her medical practice, and her and her husband's wish to relocate to an area where educational opportunities would be better for their children. In the summer of 1991, she and her family moved to Orlando, Florida. For about eight months after that, she practiced on a provisional basis in a medical clinic owned by a friend of hers there.

In the spring of 1992, the Ford Motor Company ("Ford") hired Khan to be the plant physician at its Twin Cities Assembly Plant in St. Paul. As employers often do for executive-level hirees, Ford retained a "relocation consultant," Associated Relocation Management Company,[2] to afford Khan a means of promptly liquidating the equity in her house in Sydney, and to otherwise free her attention from personal obligations attendant to her family's move to Minnesota. The record is not crystal-clear as to the mechanics of the relocation company's assistance, but apparently Khan and her husband granted the company a power of attorney to convey the house upon sale to a third party; it then advanced them a sum of money representing its determination as to the value of their equity in the house. As it turned out, this sum was $67,000.00. The Bank's interest in the home as mortgagee was ultimately satisfied in full. It is not clear whether this was accomplished by another advance from the relocation company, or from the proceeds of the sale of the home when that eventually closed in late 1992.

After they left Nova Scotia, Khan and her husband continued to try to service the two debts attributable to A to Z's real estate. As she testified (and without controversion from the Bank), she maintained telephone and mail contact with her loan officer at the Bank's Sydney office while she was in Florida and after she moved to Minnesota; at all times he knew where she was, and how to reach her. Initially, Khan and her husband used the proceeds of rental payments from other tenants in the building, as well as Khan's own income, to meet A to Z's obligations. By the time they had moved to Minnesota, however, the occupancy of the building had dwindled to nothing. In May, 1992, Khan and her husband resorted to the proceeds of the relocation company's advance on their homestead equity to meet the

---

1. As Khan stated in an affidavit, without dispute from the Bank, the Bank furnished A to Z with a loan for the initial acquisition of the commercial building. Khan and her husband then found that the amount of this loan was not enough to make the building ready for occupancy. Another lender then apparently "took out" the Bank on this transaction and advanced further funds on a mortgage-secured basis. These moneys, too, proved insufficient to finish the remodeling. The Bank then loaned Khan and her husband the sum of $65,000.00 individually and without security, to enable them "to pay some taxes that were due" and to finish work on the building. It is not entirely clear whether this last transaction was the sole source of the Bank's current claim and judgment against Khan; she and her husband had also personally guaranteed a part or all of A to Z's debt to the Bank.

2. The name of this entity might be "Asset Relocation Management Company"; both appellations appear in the schedules and pleadings Khan has filed.

$4,500.00 monthly payments on the A to Z mortgage. Throughout this period, they had the building on the market for sale; when no buyer emerged, and after Khan and her husband stopped paying on the mortgage themselves, the mortgagee commenced and concluded foreclosure proceedings.

At some point later in 1992, someone with the Bank decided to pursue its remedies at law. The Bank set off a portion of its claim against some $16,600.00 in Canadian funds that Khan had on deposit in a "Registered Retirement Savings Plan." In late November, 1992, the Bank sued Khan in the Canadian courts, for the outstanding balance on the loans it had made to her and her husband. On December 4, 1992, it received a judgment against her in the amount of $67,214.38 (Canadian).

Khan has retained her employment with Ford since the fall of 1992. In 1992, she received gross wages from Ford in the amount of $138,510.00; in 1993 she received gross wages of $112,874.00.[3] At present, Khan receives a monthly salary in the gross amount of $9,045.00, and in the net amount of $5,431.78. She has not yet received a salary increase in 1994 and does not expect to receive one.[4] Her payroll deductions are itemized as follows:

| | |
|---|---|
| Federal income tax | $1,605.52 |
| State income tax | 594.20 |
| FICA | 688.65 |
| Health care premium | 43.07 |
| "Lease car" | 681.78 |
| Total | $3,570.15 |

When Khan and her family relocated to Minnesota, they purchased a homestead in the St. Paul suburb of Rosemount. They made a down payment of $27,000.00 from the remainder of the relocation company's advance on their Nova Scotia house, and they financed the balance through a mortgage-secured loan from Investors Savings Bank. In her Schedules A and C, the Debtor values this homestead at $179,000.00. Khan maintains two motor vehicles, a 1994 Ford Taurus and a 1994 Lincoln Continental. She holds both on a leased basis through Ford or one of its subsidiaries; as a benefit of her employment, she is able to obtain the use of vehicles of the current model-year on this basis. As noted in the itemization above, she makes the lease payments through payroll deduction.

Between her amended Schedule J and her testimony, Khan estimates that her and her family's current monthly living expenses are:

| | |
|---|---|
| Home mortgage payment | 1703.00 |
| Utilities | |
| Electricity and heating | 400.00[5] |
| Water and sewer | 70.00 |
| Telephone | 60.00 |
| Home maintenance | 200.00 |
| Food | 700.00 |
| Clothing | 250.00 |
| Laundry and Drycleaning | 230.00[6] |
| Medical and dental expenses | 100.00 |
| Transportation | 100.00 |
| Recreation | 50.00 |
| Charitable contributions | 150.00[7] |
| Homeowner's insurance | 120.00 |
| Child care | 300.00 |
| School tuition | |
| Son | 485.00 |
| Daughter | 1660.00 |
| Total | $6,578.00 |

3. Khan is a salaried employee. The record does not reveal the cause for the discrepancy and decrease in her income, as between the two years. The greater sum in 1992 might be attributable to some sort of "signing bonus," a further moving-expense allotment, or other one-time augmentation, but this is unknown.

4. In his post-hearing memorandum, the Bank's counsel accuses Khan of continuing to understate her income on her bankruptcy schedules and in her testimony. He relies on no direct evidence, and argues only an inference: the amount of "income, year-to-date" stated on the March 31, 1994 paystub in evidence, if divided by three and then annualized, would show an annual income of over $151,000.00 per year. Had counsel bothered to cross-examine on this issue, this inference might have been required. As the record stands, however, another inference is equally plausible: a pay period might have spanned the new year, which would mean that the paystub included an amount of income Khan earned in 1993 but received in 1994. If this was the case, the apparent "bump" in income will be rectified by a similar carryover into 1995. Both of these inferences are equally plausible. As the proponent of a version of this fact issue that was different from the one to which Khan testified, the Bank bore the burden of persuasion. It failed to carry that burden, so the only appropriate finding as to a 1994 raise is one on Khan's testimony—the only direct evidence of record.

5. Khan testified that this is a year-round average.

6. Khan testified that her family does expend this amount for cleaning of clothing, because the more formal business attire she must wear for work requires professional dry cleaning and laundry treatment.

7. Khan testified that this is the amount she would like to donate to charity, but that her

In her testimony, Khan gave her explanations for the several items to which the Bank had taken great exception in its written motion. Though her husband has been unemployed since they left Nova Scotia,[8] Khan testified that he is regularly out of the household for days or weeks at a time; he returns to Canada to help his brother in the operation of his brother's gas station and other businesses.[9] Because she has to work 12–hour days with some frequency, and because her daughter is a full-time college student, she feels compelled to engage a babysitter to take care of her son during the time between the end of his school day and the end of her work day.

Both of Khan's children are enrolled in private schools, her daughter at the College of St. Catherine in St. Paul and her son in an elementary program at Convent of the Visitation School in Mendota Heights. When queried as to the need for these relatively costly placements, Khan stated that she felt compelled to give her children as good an education as she could, as her parents had done the same for her in Pakistan. Her daughter is not currently employed, even on a part-time basis, and apparently does not receive financial aid from her college.

In her original Schedules D, E, and F, Khan listed only one secured debt (her Minnesota homestead mortgage), no priority debts, and only two unsecured debts—the one in favor of the Bank and a $353.00 debt to the Eagan Athletic Club. As it turned out, the latter of the unsecured claims had been satisfied by a wage garnishment shortly before Khan's bankruptcy filing. In an amended Schedule F filed after the Bank served her with the present motion, she deleted it and added two more entries.

These new entries are stated in an equal amount, $34,093.63, which Khan characterizes as "disputed". One entry gives Ford as the claimant, and the other, "Assoc. Relocation Management Co." As Khan testified, these entries represent a single claim against her. It arose out of an additional, and apparently unforeseen, payment or payments that the relocation company made when it undertook to clear title to the Nova Scotia home. As Khan explained it—but none too clearly—certain creditors of A to Z somehow asserted liens against the home and its proceeds, and the relocation company satisfied them to get the sale closed. It then made a claim against Ford and/or Khan for reimbursement of these amounts. Ford presented Khan with the situation, but only some six weeks after she filed for bankruptcy. It is not clear whether its presentation was a demand for payment as such, but she has now acknowledged its claim by amending her debt schedules.

Khan acknowledges that her sole motivation in filing for bankruptcy was the Bank's collection pressure against her, the prospect that it would garnish her wages, and her belief that she then would be unable to pay for her children's private-school education.

## II. *In re Hamblin*

Debtor McKinley Hamblin filed a voluntary petition for relief under Chapter 7 on January 7, 1994. TIC is the largest creditor set forth on his schedules by far, holding a claim in the scheduled amount of $20,-032.00.[10] TIC's claim was reduced to judg-

---

family just does not have the money to do so at present.

8. Khan testified that her husband has a bachelor's degree in English from a Pakistani university, but no other formal job training. In Nova Scotia he managed A to Z's commercial building, as its paid employee.

9. Khan testified that her brother-in-law pays the expenses of her husband's travel for these trips, but does not pay him a wage. She stated that the brothers agreed to this arrangement because the brother-in-law had helped them in the operation of A to Z.

10. Hamblin's only other scheduled unsecured debts are a small loan from a finance company, in the scheduled amount of $939.00, and child support arrearages, in the scheduled amount of $1,565.00. For secured claims, he lists a total of three. Two are in favor of different creditors that hold first and second mortgages against his homestead, with a total outstanding balance of

ment in June, 1992, in the Minnesota State District Court for the Second Judicial District, Ramsey County. The claim arose out of an automobile accident in which Hamblin and a third party were involved, at a time when he lacked statutorily-mandated liability insurance on his vehicle. The third party was acting in the course and scope of her employment at the time of the accident, and received workers' compensation benefits from TIC. TIC became subrogated to her rights to the extent of its payment to her, and then enforced those rights against Hamblin personally in the absence of a liability insurer.

The record presented for this motion fell far short of ideal.

As documentary support to carry his initial burden on his client's motion pleadings, TIC's counsel relied solely on various averments in Hamblin's bankruptcy statements and schedules. In his pleadings he gave "notice that should testimony [have been] required at the hearing on this matter, movant [would] call [Hamblin] and [his] wife," but he did not use a subpoena to compel the attendance of either of them.[11]

In his own turn, Hamblin's counsel failed to get his client to attend the hearing; he only filed a terse "answer" to the motion, verified by his client, and a one-page memorandum of law that did not cite a single published court decision.[12] In the text of the verified response, Hamblin recited various extrinsic facts to explain some of the entries in his statements and schedules with which TIC took issue. He then purported to "amend" the amounts set forth in various expense line-entries in his Schedule J, to correct what he now acknowledges were "less realistic," or erroneous, figures.

less than $9,200.00. The third is in favor of his Chapter 7 counsel, and purportedly secures the attorney fee for this case.

11. His memorandum suggests he was also going to rely to some extent on Hamblin's testimony at the meeting of creditors convened pursuant to 11 U.S.C. § 341. That testimony, of course, was not given as part of a judicial proceeding—and, absent proffer and admission in the form of an authenticated transcript, it is not part of the record of the bankruptcy case at all.

In the last instance, Hamblin does not contest a number of the ultimate facts on which TIC bases its request for dismissal. This does not tip the result on TIC's motion; as will be seen, TIC is not well-put in characterizing those ultimate facts as material. To establish the backdrop to the controversy, however, it is appropriate to summarize the apparent state of Hamblin's personal financial condition.

In his Schedule I, Hamblin gives his occupation as "Factory," his employer as North Star Steel of Newport, Minnesota, and his length of employment as "24 years." He schedules his own average monthly gross income as $3,027.00, subject to the following payroll deductions:

| | |
|---|---|
| Payroll taxes and Social Security | 984.00 |
| Insurance [type not specified] | 85.00 |
| Union dues . | 43.00 |
| "401K, Child Support & Laundry" | 492.00 |

This, Hamblin states, results in a net monthly income for himself of $1,423.00. He discloses that his spouse has monthly income (apparently net) of $1,118.00, resulting in a total household income of $2,541.00.

On his Schedule J, he states the following household expenditures:

| | |
|---|---|
| Mortgage payments | 635.00 |
| Home maintenance | 300.00 |
| Utilities | |
| Electricity and Heating | 200.00 |
| Water and sewer | 50.00 |
| Telephone | 30.00 |
| Garbage collection | 20.00 |
| Food | 400.00 |
| Clothing | 150.00 |
| Medical and Dental expenses | 40.00 |
| Transportation | 200.00 |
| Recreation | 150.00 |
| Auto Insurance | 200.00 |
| "Spouses [sic] Debt & Cable" | 458.00 |
| TOTAL | $2,808.00 |

Via his verified response, Hamblin would amend these entries to provide as follows:

12. This was all counsel did, and he did not do it particularly well. Among other things, the use of a unitary "verified response," rather than a responsive pleading and a separate, particularized affidavit, has not been acceptable practice in this court for three years. *See* LOC.R.BANKR.P. (D.MINN.) 1202(b); *In re Mathern*, 137 B.R. 311, 319 n. 9 (Bankr.D.Minn.1992).

| | |
|---|---|
| Mortgage payments | 635.00 |
| Home maintenance | 150.00 |
| Utilities | |
| Electricity and Heating | 200.00 |
| Water and sewer | 50.00 |
| Telephone | 30.00 |
| Garbage collection | 20.00 |
| Food | 400.00 |
| Clothing | 75.00 |
| Laundry & drycleaning | 10.00 |
| Medical and Dental expenses | 60.00 |
| Transportation | 276.00 |
| Recreation | 75.00 |
| Auto Insurance | 167.00 |
| "Spouses [sic] Debt & Cable" | 458.00 |
| Expenses of out-of-state visitation with child | 75.00 |
| TOTAL | $2,681.00 |

As Hamblin acknowledged, he will pay off the debt secured by both mortgages against his homestead within 13 to 14 months of the date of his bankruptcy filing.

Hamblin acknowledges that he was prompted to file for bankruptcy because TIC initiated garnishment of his wages in collection on its judgment in December, 1993.

## DISCUSSION

### I. General

■ The movants in both of these cases have styled their requests for dismissal under 11 U.S.C. § 707(a). That statute provides:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—

 (1) unreasonable delay by the debtor that is prejudicial to creditors;

 (2) nonpayment of any fees or charges required under Chapter 123 of Title 28 [of the United States Code]; and

 (3) failure of the debtor in a voluntary case to file, within 15 days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph 1 of ... [11 U.S.C. § ] 521, but only on a motion by the United States Trustee.

Though this statute recites three specific examples of "cause" for dismissal of a Chapter 7 case, these examples are not exclusive.

Under the rule of construction prescribed by 11 U.S.C. § 102(3), " 'includes' and 'including' are not limiting." Thus, the bankruptcy court is empowered to dismiss a Chapter 7 case for a "cause" other than the three specified in §§ 707(a)(1)–(3). H.R.REP. No. 595, 95th Cong. 1st Sess 380 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 94 (1978); *In re Kempner,* 152 B.R. 37, 39 (D.Del.1993); *In re Cecil,* 71 B.R. 730, 733 (Bankr.W.D.Va.1987).

■ At least as evidenced by the reported caselaw, one sort of alternative, extra-statutory "cause" is recognized by many courts: "bad faith" on the part of a debtor that so taints a filing for Chapter 7 relief that the debtor is judicially deemed unworthy of receiving any part of that relief. *E.g., In re Zick,* 931 F.2d 1124 (6th Cir.1991); *In re Studdard,* 159 B.R. 852 (Bankr.E.D.Ark. 1993); *In re Hammonds,* 139 B.R. 535 (Bankr.D.Colo.1992); *In re Doss,* 133 B.R. 108 (Bankr.N.D. Ohio 1991); *In re Campbell,* 124 B.R. 462 (Bankr.W.D.Pa.1991); *In re Rognstad,* 121 B.R. 45 (Bankr.D.Haw.1990); *In re Bingham,* 68 B.R. 933 (Bankr.M.D.Pa. 1987); *In re Khan,* 35 B.R. 718 (Bankr. W.D.Ky.1984), *remanded,* 751 F.2d 162 (6th Cir.1984).

As might be expected from the way in which the courts have framed this concept, many of the published decisions that grant dismissals of Chapter 7 cases for "bad faith" are fact-intensive, and probably fact-specific. Nonetheless, the authors of most of these opinions seem to feel compelled to announce broadly-framed maxims that, they say, govern the disputes before them. They then opine that the application of such precepts leads to only one possible outcome in the case before them. That, of course, is the ejection of the offending debtor from the protection of the bankruptcy process, after a branding as a rapacious and unworthy person who has attempted to subvert statutory remedies meant only for more "deserving" and more impecunious petitioners. *E.g., In re Studdard,* 159 B.R. at 856–857; *In re Hammonds,* 139 B.R. at 542–543; *In re Rognstad,* 121 B.R. at 50–51.[13] To borrow an

---

**13.** Many of these decisions force a contrast by quoting the immemorial chestnut from *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct.

695, 699, 78 L.Ed. 1230 (1934): the proper role of bankruptcy under American law is to provide "the honest but unfortunate debtor ... a new

apt characterization from a bankruptcy opinion involving comparable considerations, too many of these decisions "appeal ... to one's general sense of righteousness," but veer too close to being "contrary to clearly established law." *Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 877 (8th Cir.1988) (R. Arnold, J., dissenting).

In the first place, the analysis in many of these opinions opens with a sweeping pronouncement that good faith in the filing of a Chapter 7 petition is "an implicit jurisdictional requirement." *E.g., In re Zick,* 931 F.2d at 1126–1127; *In re Studdard,* 159 B.R. at 856; *In re Hammonds,* 139 B.R. at 541; *In re Campbell,* 124 B.R. at 464; *In re Rognstad,* 121 B.R. at 49; *In re Brown,* 88 B.R. 280, 283 (Bankr.D.Haw.1988); *In re Khan,* 35 B.R. at 719. This sentiment sounds all very noble, but it has more resonance for a layperson's perception of the judicial process than for a professional's understanding of it. Such pronouncements are never accompanied by a statutory citation, and for a good reason: there is none.

In the bankruptcy context, "jurisdiction" is the basic ability of the United States District Court to exercise the power of the federal government over a debtor and its pre-bankruptcy legal relationships with its creditors. Jurisdiction over bankruptcy cases and proceedings is conferred by 28 U.S.C. §§ 1334(a)–(b). These provisions [14] empower the District Court to automatically assume jurisdiction in a voluntary bankruptcy case once a debtor performs the simple, ministerial act of filing a petition for relief under Title 11, pursuant to 11 U.S.C. §§ 301 and 302.[15]

In turn, the eligibility of a debtor for a given form of bankruptcy relief is governed by 11 U.S.C. § 109. Sections 109(a)–(b) set the eligibility for relief in liquidation under Chapter 7. To establish eligibility for bankruptcy relief in general, the former provision requires no more than some sort of territorial nexus between the petitioner and the United States of America:

> (a) Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under [the Bankruptcy Code].

The latter provision operates solely by exclusion; it specifies who may *not* be a debtor under Chapter 7:

> (b) A person may be a debtor under chapter 7 of [the Bankruptcy Code] only if such person is not—
>
> (1) a railroad;
>
> (2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, or industrial bank or similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h)); or
>
> (3) a foreign insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, or credit union, engaged in such business in the United States.

By negative inference, then, any other "person" [16] can file a petition under Chapter 7 and then can proceed to obtain the full panoply of relief thereunder, as long as some other statutory impediment does not present itself through a motion or adversary proceeding commenced in the case.

---

opportunity in life and a clear field for future effort."

**14.** They read in pertinent part as follows:
(a) Except as provided in [28 U.S.C. § 1334](b) ... the district courts shall have original and exclusive jurisdiction of all cases under [the Bankruptcy Code].
(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code].

**15.** The District Court then delegates its judicial authority by reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a).

**16.** In pertinent part, 11 U.S.C. § 101(41) provides that " 'person' includes individual, partnership, and corporation ..."

Nowhere do any of these statutes, by their terms, require a debtor in a voluntary case to plead or attest to his or her good faith on the face of a petition, as a prerequisite to the opening of a case file in the bankruptcy court or as a preliminary to the assumption by that court of judicial authority over the debtor and its creditors. *Zick* and the other cases that posit good faith as a looming "jurisdictional requirement," then, position the issue at a level far too basic in the legal superstructure of the bankruptcy process.

■ In this welter of caselaw, at least one court has pondered with substantial justification whether the amorphous concept of "good faith" has any applicability to a request for dismissal under § 707(a). *In re Latimer*, 82 B.R. 354, 363–364 (Bankr.E.D.Pa.1988). There is much to be said for the *Latimer* court's reservations.[17] In the last instance, however, one must concede that, on motion of a creditor, a court may inquire into a debtor's motivation for filing as a test of whether to allow the debtor to go forward in bankruptcy. This is so, if for no reason other than that any federal court has an "inherent" (if too-often ill-defined) power to regulate its own docket to ensure that its process is not being abused. *E.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 2132–2133, 115 L.Ed.2d 27 (1991).

■ The courts that have recognized this function have done so by arrogating a "fundamental power" to themselves, without identifying specific authority in a statute or rule. Because the application of such a power springs from an institutional role and not

from a specific statutory empowerment, a court should exercise it with great parsimony. *Chambers v. NASCO, Inc.*, 501 U.S. at 44, 111 U.S. at 2132. In the context at bar, such an exercise should be virtually always on motion of a party and in an adversary context, and only in cases where a debtor's actions would bring about a clear subversion of congressional intent, as clearly enunciated in the law.

■ Having concluded with no more than a minor leap of faith that a creditor may raise a debtor's bad faith as "cause" for dismissal under § 707(a), one then must face the question of just what is cognizable as such. Most of the courts that have ruled unfavorably to debtors on this issue in published decisions have emphasized that the debtors before them were likely to have significant financial resources after bankruptcy, in the form of substantial personal income or through the retention of valuable assets. *E.g., In re Zick*, 931 F.2d at 1128; *In re Hammonds*, 139 B.R. at 542; *In re Campbell*, 124 B.R. at 464–465; *In re Brown*, 88 B.R. at 284. These decisions are fundamentally flawed in their analysis, however, because the question of whether a Chapter 7 debtor could meet dischargeable debt obligations in whole or part from future resources is irrelevant to a motion under § 707(a).

This conclusion is fully supported by two different sources of authority.

First, the legislative history for the original enactment of § 707(a), as part of the

---

17. As noted earlier, there is no explicit requirement of "good faith in filing" anywhere in the Bankruptcy Code. One suspects that this is due in part to a certain dissonance between the basic notion (at least as it is enunciated in the caselaw), and the matrix of historical facts out of which virtually all bankruptcy cases spring. Human nature and prevailing social mores are such that individual Chapter 7 debtors almost never file without anticipating and intending their case to have a legal and economic effect on their prepetition creditors. Perforce, that effect is a detrimental one: the termination of the creditors' pre-petition legal rights to enforce their claims against the debtor personally. To be sure, the basic function of bankruptcy under American law is to furnish remedies to both creditors and debtors. *In re Schuster*, 132 B.R. 604, 611

(Bankr.D.Minn.1991). However, it stretches the imagination to conceive of a debtor filing for Chapter 7 out of the sole or predominant motivation to create an estate and to see that creditors' claims are satisfied from it. In late 20th century America, individual debtors file for Chapter 7 to receive personal relief from their debts, and for no other reason that has any significance to the issue at bar. 11 U.S.C. § 727(a) makes a grant of discharge mandatory and automatic in the absence of sustained objection; such objection must be made on one of the strictly-defined and narrow grounds specified in the statute. The Bankruptcy Code, then, virtually creates broad and unqualified debt relief as an entitlement of a petitioner under Chapter 7. *A fortiori*, the law shelters the motivation to achieve that goal, with very few exceptions.

Bankruptcy Reform Act of 1978, speaks quite clearly to this issue:

> [11 U.S.C. § 707(a) ] does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy. The Committee has rejected that alternative in the past, and there has not been presented any convincing reason for its enactment in this bill.

H.R.REP. No. 595, 95th Cong. 1st Sess. 380 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 94 (1978).[18]

More general principles of statutory construction mandate the same conclusion. As part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress added 11 U.S.C. § 707(b) to the existing provisions of § 707(a). Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 312, 98 Stat. 333, 355 (1984). Congress then amended it in 1986. Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, § 219(b), 99 Stat. 3088, 3101 (1986). This statute presently provides:

After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss the case filed by an individual debtor under [Chapter 7] whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of [Chapter 7]. There shall be a presumption in favor of granting the relief requested by the debtor.

As most circuit courts of appeal, including the Eighth, have concluded, the Bankruptcy Court may dismiss a Chapter 7 case under § 707(b) upon proof that a debtor could fund a confirmable Chapter 13 plan, or otherwise meet at least a significant portion of his or her pre-bankruptcy debt obligations without undue hardship. *E.g., Fonder v. United States*, 974 F.2d 996 (8th Cir.1992); *United States Trustee v. Harris*, 960 F.2d 74 (8th Cir.1992); *In re Walton*, 866 F.2d 981 (8th Cir.1989); *In re Kelly*, 841 F.2d 908 (9th Cir.1988); *In re Krohn*, 886 F.2d 123 (6th Cir.1989). Since §§ 707(a)(1)–(2) were law before the enactment of § 707(b),[19] one must construe § 707(a) in light of the nature of the components of § 707.

---

**18.** To be sure, in its recent bankruptcy jurisprudence the Supreme Court has, with very few exceptions, limited the cited sources for its authority to the text of the Code provisions themselves. In most all of its recent bankruptcy decisions, the Court has favored a "common-sense" construction of statutory language on its face as the means for fixing the scope and effect of that language. *Rake v. Wade*, —— U.S. ——, —— —— ——, 113 S.Ct. 2187, 2192–2193, 124 L.Ed.2d 424 (1993); *Patterson v. Shumate*, —— U.S. ——, —— —— ——, 112 S.Ct. 2242, 2246–2247, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz*, 503 U.S. ——, —— —— ——, 112 S.Ct. 1644, 1647–1648, 118 L.Ed.2d 280 (1992); *Barnhill v. Johnson*, 503 U.S. ——, —— —— ——, 112 S.Ct. 1386, 1388–1391, 118 L.Ed.2d 39 (1992); *U.S. v. Nordic Village, Inc.*, —— U.S. ——, —— —— ——, 112 S.Ct. 1011, 1014–1016, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, 502 U.S. 151, ——, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1992); *Toibb v. Radloff*, 501 U.S. 157, 160–161, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991); *Hoffmann v. Connecticut Dept. of Income Maintenance*, 492 U.S. 96, 101–102, 109 S.Ct. 2818, 2823, 106 L.Ed.2d 76 (1989) (plurality opinion). Under the strictest application of such a "textualist" (or "plain-language") approach, the courts eschew any reference to committee reports, floor statements, and other indicants of congressional intent that lie outside the statutory text. However, the use of legislative history to ascertain underlying congressional intent still is appropriate where an ambiguity appears on the face of a statute. *E.g., Barnhill v. Johnson*, 503 U.S. at ——, 112 S.Ct. at 1391; *Toibb v. Radloff*, 501 U.S. at 162, 111 S.Ct. at 2200; *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). One can find little better example of such an ambiguity than nonexclusive statutory language allowing a grant of particular relief for "cause" shown. Even if accompanied by examples of the problems that the legislation can be used to address, any reference to generalized "cause" raises a question as to just what does and does not constitute grounds for relief within the scope of the statute. So it is here. Extrinsic evidence of Congress's pre-enactment intent is perfectly relevant. That evidence shows that cause under § 707(a) does not include an anticipated ability on the debtor's part to meet future obligations without going through bankruptcy liquidation.

**19.** They were part of the comprehensive enactment of the Bankruptcy Code of 1978, Pub.L. No. 95–598, § 101, 92 Stat. 2549, 2606 (1978).

In this light, it is crucial to note that § 707(b) is of more limited scope than § 707(a). By its terms, § 707(b) applies only to the cases of debtors whose debts are "primarily consumer debts" [20]; it may be invoked only on motion by the U.S. Trustee or by a bankruptcy judge acting *sua sponte;* and, when it is invoked, the responding debtor enjoys a "presumption" in favor of the relief he or she has previously requested— *i.e.,* remaining in bankruptcy to receive a discharge eventually. Under general canons of statutory construction, the very textual differences between the two parts of § 707 compel a specific result to the issue at bar.

 The federal courts are under a mandate to construe provisions within a statute to be consistent with one another, and to attribute meaning to all provisions of a statute without creating superfluity. *Helvering v. Credit Alliance Corp.,* 316 U.S. 107, 112, 62 S.Ct. 989, 992, 86 L.Ed. 1307 (1942); *Koenigsberger v. Richmond Silver Mining Co.,* 158 U.S. 41, 48, 15 S.Ct. 751, 754, 39 L.Ed. 889 (1895). Where both a specific and a general statute address the same subject matter, the specific one takes precedence regardless of the sequence of enactment, and must be applied first. *Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980); *Preiser v. Rodriguez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973). More crucially to the present analysis, specific provisions within a statute control over more general provisions, where the latter in their most comprehensible sense would embrace the same issues addressed by the specific provision. *United States v. Cihal,* 336 F.Supp. 261, 267 (W.D.Pa.1972), *aff'd,* 497 F.2d 922 (3d Cir.1974). These precepts apply to § 707 as follows.

In enacting § 707(b), Congress clearly was speaking to the issue of those debtors in Chapter 7 whom it thought should not be in liquidation through bankruptcy, because they would have the resources to pay their creditors in the future. It did so by enacting a narrowly-drawn statute. The power to invoke that statute is granted to only two participants in the bankruptcy process.[21] Congress limited the class of petitioners whose cases would come under such scrutiny, to debtors whose financial distress arose from non-business transactions.

Under the canons previously noted, this statute must be deemed to be Congress's word as to the scope of the remedy of dismissal on a particular sort of ground: only pursuant to the authority of this statute, and subject to its strictures, can the Bankruptcy Court dismiss a Chapter 7 case on a finding that a debtor could pay his or her debts in whole or in part from future personal income. The more generally-defined remedy of dismissal for "cause" under § 707(a) simply cannot lie on the same set of facts. *Accord, In re Bridges,* 135 B.R. 36, 37–38 (Bankr. E.D.Ky.1991); *In re Young,* 92 B.R. 782, 784 (Bankr.N.D.Ill.1988); *In re Goulding,* 79 B.R. 874, 875–76 (Bankr.W.D.Mo.1987); *In re Frisch,* 76 B.R. 801, 803–04 (Bankr.D.Colo. 1987); *In re Cecil,* 71 B.R. at 733.

In passing on a motion for dismissal under § 707(a), then, the Bankruptcy Court should exclude any consideration that goes to the debtor's financial means. It cannot make judgmental pronouncements that the debtor really should be paying his or her debts rather than seeking refuge in bankruptcy liquidation. *In re Goulding,* 79 B.R. at 876.

What, then, can constitute evidence of "bad faith" as cause for dismissal of a Chapter 7 case?

 To do full justice to the canons of construction cited previously, it should not consist solely of anything that, in isolation, would merit a more limited form of punitive sanction; Congress must be deemed to have spoken to those evils by already setting up the other remedies. Cause for denial or revocation of discharge under 11 U.S.C.

---

**20.** In turn, 11 U.S.C. § 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose."

**21.** Those parties, of course, are the U.S. Trustee and the Court—the ones, obviously, that Congress deemed to be more neutral and detached, having no financial interest in the question of whether the debtor is to be in bankruptcy or out of it.

§§ 727(a) and 727(d), grounds for a determination of nondischargeability of an individual debt under 11 U.S.C. § 523(a), or a basis in law or fact for disallowance of a claimed exemption then should not be deemed to suffice, at least if standing alone. In creating these more circumscribed remedies, Congress clearly contemplated that a bankruptcy case could proceed to dispense remedies *to creditors*, notwithstanding the debtor's past commission of certain proscribed acts that contravened public policy. Individual creditors or the trustee can seek more particularized redress under §§ 522, 523, or 727, without the detriment of losing the centralized remedy of administration of assets that dismissal would otherwise cause. *In re Lang*, 5 B.R. 371, 375 (Bankr.S.D.N.Y.1980). Giving this construction to § 707(a) allows the garnering, liquidation, and distribution of nonexempt assets to go forward, even if the debtor is not entitled to the full array of relief he or she had expected.[22]

■ "Good faith" and its absence necessarily being subjective factors, the Court should look first at the debtor's manifested attitude toward the integrity of the bankruptcy process. *Cf. In re Kellogg Square Partnership*, 160 B.R. 343, 353–354 (Bankr. D.Minn.1993) (construing good faith requirement of 11 U.S.C. § 1129(a)(3), for confirmation of Chapter 11 plan); *In re Estus*, 695 F.2d 311, 316 (8th Cir.1982), *In re Sitarz*, 150 B.R. 710, 721 (Bankr.D.Minn.1993), and *In re Cordes*, 147 B.R. 498, 503 (Bankr.D.Minn. 1992) (all construing good faith requirement of 11 U.S.C. § 1325(a)(3), for confirmation of Chapter 13 plan). The real question should be whether the debtor is in bankruptcy with an intent to receive the sort of relief that Congress made available to petitioners under the chapter in question—subject, of course,

to any statutory limitations on the extent of that relief—and is willing to responsibly carry out the duties that Congress imposes on debtors as the cost of receiving such relief. *Cf. In re Kellogg Square Partnership*, 160 B.R. at 354–57; *In re Sitarz*, 150 B.R. at 721; *In re Cordes*, 147 B.R. at 503.

■ With the subject so identified, bad faith in the filing of a Chapter 7 petition would be evidenced by a pervasive and orchestrated effort on the part of the debtor to obtain the benefits of a bankruptcy filing while at the same time intentionally and fraudulently taking action to avoid any of the detriments. Such an effort might involve an intention to file solely to interpose the automatic stay of 11 U.S.C. § 362(a) against pending litigation or foreclosure, without a concomitant acceptance of the statutory duties of financial disclosure, cooperation with the trustee, and surrender of non-exempt assets. It might also be prompted by a vindictive motivation to use bankruptcy solely as a "scorched-earth" tactic against a pressing creditor or opponent in litigation. *Cf. In re Mill Place Partnership*, 94 B.R. 139, 141 (Bankr.D.Minn.1988) (applying good-faith requirement of 11 U.S.C. § 1129(a)(3)).

■ Of necessity, a "bad faith filing" would involve manifested dishonesty toward a legal tribunal. That tribunal, of course, could be the forum Bankruptcy Court.[23] However, it could be another court that had jurisdiction over the debtor in a pre-petition proceeding, and from whose jurisdiction the debtor is seeking refuge in bankruptcy. Credible evidence that the debtor is seeking to use the Bankruptcy Court's jurisdiction to hide from an adjudication of contempt in a nonbankruptcy court, without justification in

---

**22.** At least one court has opined in *dictum* that grounds for denial of discharge "might be considered cause for dismissal" under § 707(a). *In re Kragness*, 63 B.R. 459, 465 (Bankr.D.Ore. 1986). This erroneous observation is the only point that mars an otherwise-thoughtful and principled decision on the issues at bar.

**23.** Pre- or post-filing actions in connection with the bankruptcy case that could support the finding would consist of systemic and deliberate misstatements or omissions on bankruptcy sched-

ules; knowingly false testimony at a meeting of creditors or a court hearing; and intentional acts to hinder the trustee in the administration of the estate and the investigation in connection with it. To taint the whole filing, there should be something more than an isolated instance or two of such conduct. A single such infraction, or even scattered ones, might merit one of the more limited sanctions, but they probably would not compel an inference of the sort of permeating animus that "bad faith" entails.

the form of true financial distress, would support a finding of bad faith in filing.

■ Dismissal, of course, cannot be automatic on a finding of any one of these acts or conduct. Caution in dispensing the remedy of dismissal for bad faith is also prompted by the need noted earlier, to maintain the balance of remedies in bankruptcy. The Bankruptcy Court should abdicate its jurisdiction over the debtor and the estate only if, in fact, there is no form of relief available to creditors through bankruptcy. This would only occur only if the estate contained no nonexempt assets or rights of recovery that had any significant value, and if there were no other compelling need to keep the debtor under the authority of the Bankruptcy Court for investigative or administrative purposes.

■ Particularly given the record presented on these cases, it would be inappropriate to expound on the attributes of this standard any further. There is certainly more to be said, but judicial restraint suggests that a truncated discussion is most appropriate on the facts at bar. It goes without saying, however, that any determination must be made on a full consideration of all of the circumstances, before a court can conclude that the evidences of bad faith mount to the critical mass necessary to meet the first stage of the inquiry.

## II. The Result: *In re Khan*

■ In light of the governing standard just adopted, the Bank's motion must fail.

Despite adequate opportunity,[24] the Bank brought forward no evidence that Khan has perpetrated a fraud on any other tribunal. Khan has never denied that she owes the scheduled debt to the Bank; she did not interpose a defense, sham or meritorious, in the Canadian collection action. Though the Bank's counsel summarily accuses Khan of "jurisdictional gymnastics," he fails to identify another forum or tribunal that the Debtor has used as a springboard to vault onto the soft mat of bankruptcy.

Nor is there any evidence that Khan has lied to or sought to mislead this Court, her

trustee, or any other party to the bankruptcy process. To be sure, the entries on her original bankruptcy schedules were rather sparse; they contained a number of entries that her in-court testimony contradicted; and amendments to her Schedules F and J were forthcoming only after the Bank brought on its motion. The uncontroverted evidence gives the lie to the adverse inferences that the Bank urges from the content of these documents, however. The addition of the Ford/Associates Relocation Management claim came as late as it did because Khan was unaware of it until some six weeks into the case. Her counsel forwarded a copy of the clerk's initial notice of the case to these entities immediately thereafter, and filed a copy of his transmittal letter so they would be added to the case matrix. The formal amendment of the Schedule F was only window-dressing, insofar as the content of the court file was concerned. The late amendment to Khan's Schedule J, which added the substantial tuition expenditures for her children's schooling, is less well-explained. Ultimately, however, it is not prejudicial. The only negative consequence from the appearance of a significant income surplus under the original schedule fell solely on Khan: creating exposure to a motion for dismissal for substantial abuse under § 707(b). There is no countering evidence to challenge Khan's testimony that she actually makes these expenditures in the amount stated. While the Bank has raised a justiciable issue as to whether these expenditures properly support Khan's protests of an inability to pay her creditors, the issue is not cognizable under the statute that governs the Bank's motion. Finally, the discrepancies between the schedules and Khan's testimony as to the past and current amount of her salary are fairly attributed to sloppiness in the preparation of the schedules—but they certainly do not result from active fraud on her part.

To the extent that the Bank could support its motion with evidence of intentional conduct on Khan's part to hinder, delay, or defraud it as a creditor, it failed to do so. First, for reasons unknown, the Bank did not

---

**24.** The first hearing on the Bank's motion was held three months into Khan's case. On Khan's motion, and over the strenuous objection of the

Bank's counsel, the Court continued the hearing for another three weeks.

produce a witness to support its counsel's accusation that Khan tried to hide her whereabouts after her family moved from Canada. Khan's testimony to the contrary, and corroborating documentary evidence, carries this fact point entirely in her favor. Second, the record certainly does not support the Bank's vague suggestion that Khan's debt to it was somehow tainted by the quality of a luxury purchase. Entirely to the contrary, the deficiency she owed as of the commencement of this case was attributable to a business failure. This, of course, is just the sort of debt that bankruptcy remedies under Anglo–American law have addressed since their creation in early modern times.

■ In short, there is no evidence that Khan is attempting to defraud this Court. Nor is there anything to suggest that she has tried to avoid the consequences of a fraud on or contempt of any other tribunal, by seeking the protection of the bankruptcy laws. Nothing indicates that she filed solely to stall the Bank's collection action, without an intent to take the negative consequences of being a petitioner in bankruptcy. The fact that the Bank is her only creditor, or perhaps the predominant one of only two, matters not one whit; though the Bank's counsel argues at length that a "one-creditor bankruptcy" is ripe for dismissal under either of the provisions of § 707, the Code sets no threshold requirement as to a number of scheduled claims or a total amount of debt as a prerequisite for obtaining Chapter 7 relief.[25] Any deficiency in Khan's entitlement to bankruptcy relief that may stem from her choices in allocating her substantial personal income can—and still may—be addressed in the context of a motion made under § 707(b).

The only probative evidence that Bank brought forward on its motion was, ultimately, irrelevant to the legal theory under which it proceeded. This compels the denial of its motion for dismissal.

### III. The Result: *In re Hamblin*

■ For essentially the same reasons, TIC's motion as to Hamblin's case must be denied.[26] Again, this debtor's "repayment ability," while argued at length by the U.S. Trustee in joining TIC's motion, is not relevant in this context. Similarly, the fact that TIC is Hamblin's predominant creditor, and perhaps his only dischargeable unsecured one, does not matter.

TIC's claim against Hamblin arose as a result of an unlawful and irresponsible act on his part—but, in the last instance, it was no more than a negligent one. Under American law, bankruptcy has always been a haven from the financial consequences of negligence. There is nothing in the record to evidence anything but a comparable degree of negligence, insofar as Hamblin's interactions with the judicial system are concerned. Hamblin did not set any procedural or substantive impediments in TIC's way in the state court litigation; it got just the default judgment it wanted. The sequence of events from the commencement of that suit into Hamblin's bankruptcy filing, as they appear from the record, do not evidence any strategy at all—let alone an overarching one to inflict excessive delay and cost on TIC. The schedules' shortfall in "realism" as to Hamblin's income and expenses, one can say with confidence, is attributed only to one thing: counsel's failure to give a competent, hardheaded review of the content to his client,

---

**25.** As authority for this point, the Bank's counsel cited *In re Veenhuis*, 143 B.R. 887 (Bankr. D.Minn.1992). *Veenhuis* was decided solely under the authority of 11 U.S.C. § 707(a). As such, *Veenhuis* is not appropriate authority for the present inquiry—whatever its merit under the somewhat-different considerations of § 707(b).

**26.** The Court emphasizes that the tone of this pronouncement is somewhat dry, as compared to the same one for the companion case. Khan's counsel made a game fight against the Bank's motion; he squarely addressed the relevant issues, and cited much of the extant case authority in his memoranda and argument. His client appeared; she went through some fairly unpleasant direct examination; and she clearly was dis-

comfited that, as a degreed professional, she had come to this turn at this stage in her life and career. In contrast, Hamblin apparently concluded that TIC's motion was not important enough to appear and defend personally. His counsel made no more than a summary and lackluster performance in memorandum and argument. Regardless of the relative quality of the defense as between the two cases, however, the governing law is the same, and it must be dispassionately applied to those facts that appear from the record. This is the only fair and judicious thing to do, as long as respondents join an issue by making at least a minimal formal resistance to motions against them.

when it should have been obvious that this was a "targeted bankruptcy filing" that might well be resisted by the one creditor in the crosshairs.[27]

In no material respect is the record on TIC's motion distinguishable from that for the Bank's motion in Khan's case. To the same end, TIC's motion must be denied.

### ORDER

On the basis of the foregoing memorandum, then,

IT IS HEREBY ORDERED:

1. That the Bank's motion for dismissal of Khan's case pursuant to 11 U.S.C. § 707(a) is denied.

2. That TIC's motion for dismissal of Hamblin's case pursuant to 11 U.S.C. § 707(a) is denied.

---

27. The use of the wording "targeted bankruptcy filing" is not an attempt to create a new legal term of art. Rather, the phrase connotes no more than a phenomenon: the filing of a bankruptcy petition in an attempt to discharge no more than a single, large debt owed to one persistent creditor. As any experienced debtor's attorney will (ruefully) say, the creditor in such a case often will not change its tactical frame of reference merely because the debtor moves the forum into one devoted to debt relief. It will just keep doggedly and relentlessly litigating in the Bankruptcy Court, often toward the end of taking the debtor back into the original nonbankruptcy forum via abstention, dismissal, determination of nondischargeability, denial of discharge, or dismissal of the case. Such proceedings in such cases reach their conclusions on their own merits. As a cautionary tale for debtors' counsel, however, the phenomenon has one important practical characteristic: the "quick fix" of prompt discharge available in more "standard" individual debtors' cases often becomes illusory very early on in a "targeted bankruptcy case." *E.g., In re Swan,* 156 B.R. 618, 626 n. 10 (Bankr. D.Minn.1993).