**In re Bradley PIONTEK and Shirley Piontek, Debtors.**

**Bankruptcy No. 689–60632–H7.**

United States Bankruptcy Court,
D. Oregon.

March 13, 1990.

**18**

Raymond Smith, Gastineau & Smith, Medford, Or., for debtors.

Paul Garrick, Eugene, Or., U.S. Trustee.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

This matter is before the court upon the United States Trustee's ("UST") motion to dismiss the debtors' chapter 7 case for substantial abuse pursuant to 11 U.S.C. § 707(b).[1] This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O). The UST argues the debtors have sufficient income, after expenses, to fund a chapter 13 plan and pay off their unsecured creditors; that Mr. Piontek significantly under-

stated his available after-tax income in his bankruptcy schedules and the debtors padded their expenses when amending their schedules after the motion to dismiss was filed. He argues that the Ninth Circuit's "future income" test, enunciated in *In re Kelly*, 841 F.2d 908, 914–15 (9th Cir.1988), requires dismissal of the case.

The debtors live in rural Josephine County near Grants Pass, Oregon in the town of Merlin. They have a 13 year old son. Their debts are primarily consumer debts and they own no non-exempt assets. Their unsecured debts total $13,341, $4,000 of which represents a deficiency to GMAC for a surrendered vehicle. The rest is all credit card debt. The debtors own their home, purchased in 1977, and list its market value at $55,000. The home is subject to a $52,-297.94 first mortgage and $9,028 second mortgage, secured in 1985.[2] The debtors earned $48,738 in 1988. No major medical expense, unemployment or unexpected financial crisis precipitated their descent into bankruptcy. Rather, it appears they merely succumbed to the fate of so many who are increasingly seeking bankruptcy relief—living beyond one's means in pursuit of the American dream or, alternatively, the consumer nightmare.

Mr. Piontek is a millworker and Mrs. Piontek is a secretarial supervisor. Mr. Piontek has worked for the same employer for ten years. His income for 1987 and 1988 was $29,076.59 and $26,877.51, respectively. He earns $11.22 per hour, which at 40 hours per week generates $1,944 per month gross income, or $23,328 per year. He listed $1,978 monthly gross income on his schedules and $1,286 take-home pay, which is 65% of gross income. His pay records, however, reveal that with overtime he had earned $22,684.80 in gross wages for the year as of October 15, 1989. They

1. All statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, unless otherwise noted.

2. It is conceivable that the debtors' unsecured debts could be increased under chapter 13 by $6,325.94 (the difference between the mortgage liens, $61,325.94, and alleged value of the house, $55,000) if debtors object to the second mortgagee's claim and it is found to be undersecured.

*See In re Hougland*, 886 F.2d 1182, 1183 (9th Cir.1989) (Section 1322(b)(2)'s proscription against modifying the terms of a security interest in a debtor's principal residence applies only to the allowed secured portion of a claim). The increase in the unsecured indebtedness however, then could be met by the funds available from the second mortgage payment.

also reveal he took home 74% of his gross pay. He testified he generally earns more in the spring and summer due to overtime and sometimes takes home as little as $1,200 per month. Giving him the benefit of the doubt and assuming take-home pay of $1,200 per month for the remainder of 1989, his average monthly take-home pay for 1989 was $1,555.74. There is no evidence to suggest his income will decrease in 1990.

Mrs. Piontek earned $20,311.65 in 1987 and $21,861 in 1988. She worked for The Job Council in Medford, Oregon as a contract manager for 4½ years before changing jobs in August, 1989. She presently works for Kelly Temporary Services in Grants Pass, Oregon, She took a slight pay cut in order to work in Grants Pass so the debtors could share one vehicle.

They surrendered a 1987–model car on which they owed $12,000 to GMAC after filing bankruptcy and reaffirmed the debt on their 1988 ½ ton pick-up truck purchased in October, 1988 for $17,922. The debtors filed bankruptcy on March 3, 1989, five months after buying the truck and three months after the first truck payment was due. The payment is $380 per month, admittedly high but claimed necessary by the debtors to ensure reliable transportation for their 80 mile per day commute to and from work.

Mrs. Piontek's job change resulted in a $400 income lapse for August and part of September, 1989. She earned $12,305.30 in the first half of 1989 at her previous job, taking home about $1,435 per month. She now takes home approximately $1,258.45 per month in wages after all deductions, including $114 per month for the family's medical insurance. In addition, she receives $60 per month commissions on insurance policies she used to sell to supplement her income. She maintains her insurance broker's license through continuing education courses but sells no insurance at present and has no plans to resume sales in the near future. Her total available monthly income is $1,318.45, slightly shy of the $1,340 estimated on her bankruptcy schedules.

Together the debtors have available monthly income of $2,874.19 ($1,555.74 + $1,318.45), $248 more than is listed on their bankruptcy schedules. The debtors listed the following expenses on their original and amended bankruptcy schedules:

| | | | Original Schedules (filed 3/3/89) | Amended Schedules (filed 6/23/89) |
|---|---|---|---|---|
| 1. | Home expenses: | | | |
| | a. | Rent or home loan payments (including any assessment or maintenance fee) | $ 499.00 | $ 679.00 |
| | b. | Real estate taxes | $ 0.00 | $ 0.00 |
| | c. | Utilities: | | |
| | | Electricity | $ 75.00 | $ 95.00 |
| | | Gas | $ 0.00 | $ 0.00 |
| | | Water | $ 0.00 | $ 0.00 |
| | | Telephone | $ 45.00 | $ 100.00 |
| | | Other (specify) | $ 0.00 | $ 0.00 |
| | | Total Utilities | $ 120.00 | $ 195.00 |
| | d. | Home maintenance (repairs and upkeep) | $ 50.00 | $ 50.00 |
| 2. | Other expenses: | | | |
| | . . . | | | |
| | c. | Insurance (not deducted from wages) | | |
| | | Life | $ 0.00 | $ 20.00 |
| | | Health | $ 0.00 | $ 0.00 |
| | | Auto | $ 120.00 | $ 120.00 |
| | | Homeowner's/renter's | $ 25.00 | $ 25.00 |

| | | Original Schedules (filed 3/3/89) | Amended Schedules (filed 6/23/89) |
|---|---|---|---|
| | Other (specify) | $ 0.00 | $ 0.00 |
| | Total insurance expenses | $ 145.00 | $ 165.00 |
| d. | Installment payments: | | |
| | Auto | $ 0.00 | $ 380.00 |
| | Other (specify) McMahan's | | $ 42.00 |
| e. | Transportation (not including auto payments) | $ 125.00 | $ 125.00 |
| f. | Education (including tuition and school books) | $ 0.00 | $ 50.00 |
| g. | Food | $ 425.00 | $ 600.00 |
| h. | Clothing | $ 150.00 | $ 150.00 |
| i. | Medical, dental and medicines | $ 30.00 | $ 30.00 |
| j. | Laundry and cleaning | $ 20.00 | $ 20.00 |
| k. | Newspapers, periodicals, and books | $ 20.00 | $ 20.00 |
| l. | Recreation, clubs, and entertainment | $ 75.00 | $ 75.00 |
| m. | Charitable contributions | $ 25.00 | $ 25.00 |
| n. | Other expenses (specify) | $ 0.00 | $ 0.00 |
| Total estimated current monthly expenses | | $1,684.00 | $2,606.00 |

The UST argues the debtors overstated expenses on the amended schedules for utilities, auto insurance, food and clothing after the motion to dismiss was filed. He also contends their car payment is unusually high and the $42 per month expense to McMahan's for a reaffirmed furniture debt will be repaid by April, 1990.

Mrs. Piontek testified the $120 per month auto insurance entry on the amended schedules is incorrect as it reflects payments on two vehicles, and that its inclusion was an oversight. Their actual auto insurance expense is $60 per month. Other than this admitted error the debtors argue the UST is "nit-picking" their expenses. Mrs. Piontek testified their furnace was not working last winter and they used wood as a back-up heating source. In years past they had winter electric bills over $95 per month, in addition to wood expense. The increase in their phone bill from $45 to $100 per month was due to increased long distance calls to Mr. Piontek's gravely ill father. Mrs. Piontek testified that their $150 per month clothing expense is low considering her husband goes through jeans at work, their teenage son outgrows clothes quickly and she needs nice clothes for work. The increase from $425 to $600 per month for food is due to their finishing a side of beef they had in the freezer. They allege their food bills are also high because Mr. Piontek works the graveyard shift and Mrs. Piontek works days. Consequently, they often do not eat together and buy packaged and convenience foods. She claims $600 per month is only an average figure and their actual food expense is often higher.

Fred Long, Chapter 13 trustee, testified that $400 to $500 per month for food is more reasonable for a family of three in southern Oregon, unless a job forces the debtors to eat out often, a factor not present here. I agree that $500 per month is more than adequate for this family of three. The $100 per month phone bill is also unreasonable. The debtors have not produced their phone bills as requested by the UST to corroborate their testimony. In any event, increased long-distance bills due to family crises are temporary. I'll allow a $55 per month phone budget. From the testimony the debtors' $95 per month estimate for all utilities other than phone appears reasonable, and although Mr. Long testified that $50 to $100 per month is a more customary clothing allowance under chapter 13 for a family of three, I'll allow $150 in this case.

The following adjustments indicate the debtors' actual monthly expenses are $205 per month less than the amount claimed on their amended schedules (auto insurance—$60; phone bill—$45; food—$100 = $205).

The UST is also correct that the $42 per month payment to McMahan's will cease after April, 1990.[3] Thus the debtors' expenses are inflated by $247 per month ($205 + $42). Add that to the $248 per month they understated their income and the debtors could pay $495 per month under a chapter 13 plan. This adds up to $17,820 over 36 months. The debtors could pay all of their $13,341 unsecured debt with $371 monthly payments and have $124 left over each month.[4]

Section 707(b) states:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

The Bankruptcy Code does not define substantial abuse but in *In re Kelly*, 841 F.2d at 914, the Ninth Circuit Court of Appeals held "that the debtor's ability to pay his debts when due, *as determined by his ability to fund a chapter 13 plan*, is the primary factor to be considered in determining whether granting relief would be a substantial abuse." (emphasis supplied) Moreover, it stated, "a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse." *Id.* at 915. In *Kelly* the court held that the bankruptcy judge did not abuse his discretion by dismissing a chapter 7 petition where the debtors could pay 99% of their unsecured debts with relative ease in chapter 13 by reducing their $500 per month recreation expense to $250. I note the facts in *Kelly* also contain hints of bad faith regarding the debtor's status as an attorney, his ample post-filing income

and his attempt to discharge a large debt from a state court lawsuit, although a finding of bad faith was not necessary to the court's "future income test" holding.

Three circuits and most bankruptcy courts use some form of future income test. *See In re Krohn*, 886 F.2d 123, 126–27 (6th Cir.1989); *In re Walton*, 866 F.2d 981, 984–85 (8th Cir.1989); *In re Kelly*, 841 F.2d at 915; *In re Roth*, 108 B.R. 78 (Bankr.W.D.Pa.1989); *Matter of Woodhall*, 104 B.R. 544 (Bankr.M.D.Ga.1989); *In re Andrus*, 94 B.R. 76, 78 (Bankr.W.D.Pa. 1988); *In re Rushing*, 93 B.R. 750, 752 (Bankr.N.D.Fla.1988); *In re Strong*, 84 B.R. 541, 545 (Bankr.N.D.Ind.1988); *In re Struggs*, 71 B.R. 96, 97 (Bankr.E.D.Mich. 1987); *Matter of Cord*, 68 B.R. 5, 7 (Bankr. W.D.Mo.1986); *In re Gaukler*, 63 B.R. 224, 225 (Bankr.D.N.D.1986); *In re Kress*, 57 B.R. 874, 878 (Bankr.D.N.D.1985); *In re Hudson*, 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985); *In re Grant*, 51 B.R. 385, 394 (Bankr.N.D.Ohio 1985); *In re Edwards*, 50 B.R. 933, 937–38 (Bankr.S.D.N.Y.1985).

■ Substantial abuse may also be found where there is bad faith. *See Kelly*, 841 F.2d at 915 ("This [future income test] is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown."); *In re Krohn*, 886 F.2d at 126 ("Substantial abuse can be predicated upon either lack of honesty or want of need."). As to the former, I find the debtors' behavior in the present case fails to rise to the level of bad faith.

■ Many bankruptcy courts interpret the future income test as just one factor to be weighed in the "totality of the circumstances," a more subjective standard vesting broad discretion in the bankruptcy judge. *See Matter of Tefertiller*, 104 B.R. 513, 516 (Bankr.N.D.Ga.1989); *In re Busbin*, 95 B.R. 240, 244–46 (Bankr.N.D.Ga.

---

**3.** The furniture debt may not have to be paid at all in chapter 13 after writing down the debt to the market value of the collateral.

**4.** The $124 per month surplus figure doesn't include an additional cushion that may be available to the debtors in potential tax refunds.

The debtors received a tax refund of $2,228 in 1988, which translates to an additional $185 per month. As I don't have the debtors' tax returns and W–4 statements before me, however, future refunds are purely speculative.

1989); *In re Gyurci,* 95 B.R. 639, 642 (Bankr.D.Minn.1989); *In re Herbst,* 95 B.R. 98, 101 (W.D.Wis.1988); *In re Ploegert,* 93 B.R. 641, 642 (Bankr.N.D.Ind.1988); *In re Wegner,* 91 B.R. 854, 858 (Bankr.D.Minn. 1988); *In re Penna,* 86 B.R. 171, 173 (Bankr.E.D.Mo.1988). These courts, however, are not in the Ninth or Sixth Circuits and the Eighth Circuit bankruptcy cases cited herein were decided prior to the Eighth Circuit's holding in *In re Walton,* 866 F.2d 981, which adopted a stricter "future income" test than the Ninth Circuit's (Walton's $497 per month surplus income over expenses could pay off more than two-thirds of his unsecured debt under a three-year plan, and 100% under a five-year plan).

Under the Ninth Circuit's test, which focuses narrowly on the debtors' ability to fund a chapter 13 plan, I would have no choice but to find substantial abuse in the present case if the debtors can pay off all their unsecured debts in chapter 13 with relative ease or without undue burden or hardship.[5] The debtors' reliance on *In re Braley,* 103 B.R. 758 (Bankr.E.D.Va.1989) is misplaced as *Braley* refused to embrace *Kelly*'s "future income" test and instead found there was no basis for such a test in the legislative history of § 707(b).

Notwithstanding *Kelly,* one bankruptcy judge in the Ninth Circuit recently declined to apply a strict future income analysis, reasoning that "[l]ife is too complex to make determinations of 'substantial abuse' *only* on the basis of a budget filed in chapter 7," and held, "I interpret § 707(b) to grant discretion to deny a motion to dismiss for 'substantial abuse' where there is evidence of an ability to fund some type of plan, but the court feels the debtor is entitled to the benefit of a 'fresh start' without being forced to accept chapter 13 or dismissal. There is a presumption in favor of granting the relief requested by debtor." *In re Martin,* 107 B.R. 247, 248–49 (Bankr.D.Alaska 1989). There the debt-

ors owed $9,900 in nondischargeable and priority taxes and $13,000 in unsecured debts. Although between $350 and $700 per month was available to the debtors to fund a chapter 13 plan and pay off most of their priority and unsecured debts, the court refused to dismiss the case because the debtors faced a bleak and uncertain future in a remote Alaskan outpost.

I read *Kelly* more broadly. It suggests that courts dismiss chapter 7 cases for substantial abuse whenever the debtor can pay *all* unsecured debts *without undue hardship* within three years in chapter 13, even though this disregards the prohibition in the legislative history of § 707(b) against an involuntary chapter 13. *Accord, In re Walton,* 866 F.2d at 985. It would not impose an undue hardship on the debtors here to fund a chapter 13 plan and pay their creditors. They could fund a 36 month plan, pay all their unsecured debts and still have at least $124 per month left over after paying all expenses. Therefore the UST's motion to dismiss will be granted within 10 days unless the case is first converted to chapter 13.

An order will be entered accordingly.

---

**5.** Although *Kelly* contains no express requirement that chapter 13 not create an undue burden or hardship on debtors, it cites with approval several bankruptcy cases that do use this language. This is also consistent with the legis-

lative history of § 707(b). *See* S.Rep. No. 65, 98th Cong., 1st Sess. 43 (1983) ("... [section 707(b) ] upholds creditors' interests in obtaining repayment where such repayment would not be a burden.").