In re Mohammad R. MOTAHARNIA, Debtor.

In re Supavarn BUSAYASAKUL, Debtor.

In re Florante M. ILAGAN and Fely V. Ilagan, Debtors.

Bankruptcy Nos. SV 96–24164–GM, SV 97–11662–GM, SV 97–10044–GM.

United States Bankruptcy Court, C.D. California.

Nov. 19, 1997.

---

MaryAnne Banks Wilsbacher, Office of United States Trustee, U.S. Department of Justice, Los Angeles, CA, for United States Trustee.

Stephen A. Rodriguez, Los Angeles, CA, Jarintorn Tanatchasai, Torrance, CA, for Suparvarn Busayasakul.

Brent Edward Vallens, Chatsworth, CA, for Florante & Fely Ilagan.

Andrew Edward Smyth, Los Angeles, CA, for Mohammad R. Motaharnia.

## MEMORANDUM OF OPINION AS AMENDED TO CORRECT TYPOGRAPHICAL ERROR ON NOVEMBER 13, 1997

GERALDINE MUND, Chief Judge.

### I. INTRODUCTION

The United States Trustee brought a motion to dismiss each of these chapter 7 cases pursuant to § 707 of the Bankruptcy Code.

11 U.S.C. § 707 (1994).[1] Each of the three debtors incurred substantial credit-card debt shortly prior to filing their respective bankruptcy petitions. The United States Trustee argues that the debtors have engaged in credit-card abuse and, therefore, that the cases should be dismissed under § 707.

The issue before this Court is the propriety of dismissing a chapter 7 case under § 707(a) or § 707(b) based on alleged credit-card abuse. Because this is the critical issue common in all three cases, these motions will be analyzed together.

## II. FACTS

### A. *In re Mohammad R. Motaharnia*

Mr. Motaharnia filed a voluntary chapter 7 petition on December 2, 1996. Prior to the petition date, he incurred $155,937 in unsecured debt. All but $17,500 of this indebtedness stems from sixteen unpaid credit-card balances; this credit-card debt was incurred during 1995 and 1996 and is generally comprised of cash advances as well as several thousand dollars worth of merchandise from various electronics stores. Motaharnia disputes this contention, claiming that the debt has been incurred since 1988. It appears from the evidence that he may have been obtaining cash advances on new credit cards to pay the balances owing on old credit cards as he continued to make new charges.

Motaharnia earns $2,439 per month. He has a 17-year-old son with whom he lives in a house valued at $145,000 (on which he owes $190,000). His monthly mortgage payments are $1,959. Motaharnia reports two cars: a 1990 Honda valued at $7,000 and a 1996 Mercedes Benz valued at $38,000 (on which he owes $38,280). His monthly car payments total $736. His expenses exceed his income by $1,463 per month. Motaharnia asserts that he was current with his payments until Wells Fargo Bank increased his mortgage payments from $1,126 to $1,950. However, even before the mortgage increase, Motaharnia had a cash deficit of over $600 per month, exclusive of any payment on credit-card debt

(which, at 3% of principal, would be approximately another $400 per month).

In 1994 and 1995, Motaharnia earned $36,864 and $29,625 respectively. There is no indication what his gross salary was in 1996, but he has been employed at the same company for 7 years and his budget shows a net $25,228 in salary and an additional $4,140 per year in some sort of government assistance or social security payments. It therefore appears that there has been no substantial change in earnings in the three years before filing—if there were any change, such change certainly would not be sufficient to justify the need for cash advances in excess of $100,000.

### B. *In re Supavarn Busayasakul*

Ms. Busayasakul filed a voluntary chapter 7 petition on February 7, 1997. Prior to the petition date, she accrued $142,174 in unsecured debt, all of which is based on 22 credit cards. There is no indication when this debt was incurred.

Busayasakul is self-employed, earning approximately $1,000 per month in income from the operation of a video store; she receives an additional $500 each month from her son. Her gross income for 1995 and 1996 was $9,000 and $12,000 respectively. She has monthly expenses of $1,680, $900 of which is a car payment on a 1990 Mercedes Benz valued at $35,000 (on which she owes $34,000). She pays no rent. Busayasakul's expenses exceed her income by $180 per month.

In opposition to the motion to dismiss, Ms. Busayasakul claims that she lost her video store in a 1994 earthquake and subsequently became burdened by debt to various vendors. She also argues that she has been making sincere efforts to pay off her creditors (including having her son supplement her monthly income) by making minimum payments since the earthquake. The opposition is not supported by a declaration of Busayasakul (although referred to in the caption, no declaration is attached). There is no explanation as to how the alleged 1994 business debt resulted in all of her unsecured credit-card obligations. There is also no indication

---

1. For the sake of convenience, this Court will refer to all three debtors as "Debtors," the individual debtors' cases will be indicated by that debtor's name.

where her credit-card payments have come from over the last few years when she ran at a deficit budget; nor is there an explanation as to when and how she acquired the Mercedes Benz.

### C. *In re Florante M. Ilagan and Fely V. Ilagan*

Florante M. Ilagan and Fely V. Ilagan filed a voluntary Chapter 7 petition on January 2, 1997.[2] As of January 1, 1996, the Ilagans owed a total of $47,393 in unsecured debt, $45 of which constituted credit-card debt. By December 31, 1996, they owed $176,552 in unsecured debt, approximately $95,000 of which was on 13 credit cards and was largely created by cash advances. Thus, in the 11 months preceding their bankruptcy filing, they incurred approximately $94,955 in credit-card debt. There is no explanation for this sudden increase in credit-card debt.

Florante Ilagan is unemployed and receives no income. Fely Ilagan is on disability and receives/earns $1,332 a month. The Statement of Affairs shows that, in 1995, Florante earned $13,300 and Fely received $12,702 from social security and $1,831 in pension money, thus bringing their total family income to $27,833. In 1996, according to the same information, Florante was unemployed, thus earning no money, and Fely received $14,148 from Social Security and $1,831 in pension money, making their total family income $15,979. Thus the family income dropped by approximately $988 per month in 1996. The Ilagan's family expenses of $2,626 per month, $1,798 of which is a mortgage payment, exceed their income by $1,295 per month. The Ilagans did not file an opposition to the Motion to Dismiss.

2. On May 1, 1997, the Ilagans filed a "Withdrawal of Voluntary Petition," requesting a dismissal of their case. No order on this application has been entered.

3. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 355 (1984).

4. As to the rationale behind the enactment of § 707(b),

[t]he provision was added to chapter 7 in response to concerns that some debtors who

## III. DISCUSSION

### A. Background of Section 707

Prior to 1984, § 707 consisted solely of the provisions now contained in § 707(a). The 1984 amendment renumbered the section and added § 707(b).[3] Although the legislative history does not specify why section 707(b) was enacted as a separate subsection rather than as an additional category to the original § 707, it appears that this was done because § 707(b) was meant to establish different standards for dismissal than those now included in § 707(a). Section 707(a) is quite broad in that it permits dismissal for cause; however, as indicated by the enumerated factors in § 707(a)(1)-(3), that provision is geared toward maintaining the integrity of the bankruptcy process. In contrast, § 707(b) was created to provide the court with a tool to prevent the discharge of debt owed by non-needy consumer debtors and to deal equitably when an unscrupulous consumer attempts to use the bankruptcy court as part of a scheme to take unfair advantage of his creditors. *In re Green*, 934 F.2d 568, 570 (4th Cir.1991).[4] The motions presently before this Court were brought under both § 707(a) and § 707(b), and must therefore be analyzed under the provisions of each of those sub-sections.

### B. Section 707(a)

Section 707(a) provides:

The court may dismiss a case under this chapter only after notice and a hearing and only for cause including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

could easily pay their creditors might resort to chapter 7 to avoid their obligations. Congress had earlier rejected the criterion that a debtor's ability to repay debts might be 'cause' for dismissal under section 707(b) and it rejected proposals to set specific repayment standards for denying chapter 7 relief. Instead it adopted a provision that gives the bankruptcy court discretion to dismiss a consumer case when the filing is substantially abusive.

6 Collier ¶ 707.04 (1997).

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States Trustee.

11 U.S.C. § 707(a).

■ While § 707(a)(1)-(3) contain specific categories of cause for dismissal, the list is not exclusive. *In re Brown*, 88 B.R. 280, 284 (Bankr.D.Haw.1988). Reported case law suggests other grounds for cause, including community safety and health concerns [5] and the need to advance judicial economy.[6]

Some cases have equated "cause" with the debtor's "bad faith" use of the bankruptcy system. In *In re Brown*, 88 B.R. at 280, the court dismissed the case for cause based on the debtor's attempt to shield his wealth from lawful pre-petition collection actions by transferring all profits from his medical practice to himself and his wife as supposed rents to be held as tenants in the entireties, the debtor's failure to maintain bank accounts, and the debtor's conduct of all his financial affairs on a cash basis to prevent collection by a judgment creditor.[7] In *In re Zick*, 931 F.2d 1124, 1126–28 (6th Cir.1991), the Sixth Circuit found cause based on the debtor's filing soon after a mediation award and his subsequent manipulation which left only one creditor involved with the bankruptcy case while the debtor made no significant change in lifestyle or effort to repay the debt.[8]

However, in *In re Huckfeldt*, 39 F.3d 829 (8th Cir.1994), the Eighth Circuit rejected the "bad faith" test, but found cause as a result of the debtor's attempt to frustrate a divorce-court decree and force his ex-wife into bankruptcy. The Eighth Circuit argued

that it is improper to equate "cause" with "bad faith" as:

framing the issue in terms of bad faith may tend to misdirect the inquiry away from the fundamental principles and purposes of Chapter 7. Thus, we think the § 707(a) analysis is better conducted under the statutory standard 'for cause.' If the bankruptcy court elects instead to act under the inherent judicial power to punish a bad faith litigant, that action should not be taken under § 707(a).

*Id.* at 832. Many of the "bad faith" cases rest their decisions, at least in part, on the ability of the debtor to repay some or all of the debt owing. There is no evidence that Congress intended for this to be considered cause under § 707(a).[9]

■ In determining whether bad faith constitutes cause under § 707(a), courts should adopt a narrow construction of the Code. Otherwise, it is possible that such an "inquiry will be 'employed as a loose cannon which is to be pointed in the direction of a debtor whose values do not coincide precisely with those of the court.'" *Huckfeldt*, 39 F.3d at 832, *citing In re Latimer*, 82 B.R. 354, 364 (Bankr.E.D.Pa.1988). Additionally, an underlying policy of the Bankruptcy Code, providing debtors with a fresh start while ensuring there is no abuse of the system, mandates such a strict interpretation of § 707(a)'s "cause" analysis. As such, bad faith as grounds for "cause" under § 707(a) should apply only to egregious cases where the debtor's motives are clearly inconsistent with the established purpose of the Bankruptcy Code.

■ The United States Trustee alleges that the debtors in the instant cases engaged in credit-card abuse and thus the cases are bad-faith filings that should be dismissed.

---

5. *In re Commercial Oil Serv.*, 58 B.R. 311 (Bankr. N.D.Ohio 1986).

6. *In re Schwartz*, 58 B.R. 923 (Bankr.S.D.N.Y. 1986). In this case, the debtor was seeking dismissal for cause.

7. *See also In re Houck*, 199 B.R. 163 (S.D.Ohio 1996).

8. *Zick* used the substantial abuse test of § 707(b) even though it was a case under § 707(a). Citing to *In re Zick*, the Bankruptcy Appellate Panel

("BAP") stated in dicta that cause "might include a bad faith filing." *In re Eastman*, 188 B.R. 621, 624 (9th Cir. BAP 1995) (discussing dismissal under § 305(a)(1)).

9. S.Rep. No. 989, 95th Cong., 2d Sess. 94 (1978). For an excellent analysis of why the ability to pay should not be considered as a factor in the "cause" analysis under § 707(a) *see In re Khan*, 172 B.R. 613 (Bankr.D.Minn.1994).

The United States Trustee relies or credit-card non-dischargeability cases under § 523(a)(2) to argue that the debtors' intent not to repay creditors constitutes bad faith for purposes of § 707(a). However, a finding of fraudulent intent in credit-card abuse cases, which is a determination made based on the debtor's state of mind at the time that the particular charge is incurred, is entirely different from a finding of a debtor's intent to obtain the benefits of a discharge without submitting all assets and liabilities to the supervision of the court, without dealing uniformly with all similarly situated creditors, or without providing complete and timely information as required by tae Code, Rules and court order. It is therefore not appropriate to apply the fraudulent-intent standard from credit-card non-dischargeability cases under § 523(a)(2) to the "cause" standard of § 707(a).

The debtors' motivations in filing bankruptcy and their actions as debtors throughout the bankruptcy process have been consistent with the underlying policies of our bankruptcy system. The Debtors seek a discharge of all of their dischargeable debts under chapter 7. They have filed all schedules and statements of affairs, have apparently disclosed all their assets and liabilities, have provided the trustees with the appropriate financial records to support their schedules, and are not attempting to use the bankruptcy process for any ulterior motives such as to intentionally and selectively injure a specific creditor. Therefore, because they have been acting within the purview of chapter 7, this Court finds that the particular facts in each of these cases do not amount to cause for dismissal under § 707(a).

### C. Section 707(b)

Section 707(b) provides:

After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

### 1. Timeliness of Motions

Federal Rule of Bankruptcy Procedure 1017(e)(1) mandates that a motion for dismissal under § 707(b) be brought "not later than 60 days following the first date set for the meeting of creditors held pursuant to §. 341(a)," unless the court authorizes an extension. Fed. R. Bankr.P. 1017(e)(1). The motions in the cases of Busayasakul and Ilagan were timely brought; however, the motion as to Motaharnia is untimely. In regards to Motaharnia, the first date set for the meeting of creditors was January 9, 1997; the instant motion was filed on March 14, 1997, beyond the 60-day period. The United States Trustee never sought an extension of time. Therefore, the motion to dismiss under § 707(b) in the Motaharnia case is late-filed and is denied. As a result, the discussion relating to § 707(b) pertains only to the cases of Busayasakul and Ilagan.

### 2. Primarily Consumer Debt

§ 707(b) requires that the debts of the individual against whom the motion is brought be primarily consumer in nature. Section 101(8) defines consumer debt as that "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8) (1994). The qualifier that the debt be "primarily" consumer debt has been interpreted as a requirement that more than 50% of the debt must be consumer in nature. *In re Kelly*, 841 F.2d 908, 913 (9th Cir.1988).

Ilagan does not dispute the claim that more than 50% of the debt is consumer debt. Busayasakul has opposed such a contention, alleging that a substantial portion of her debt was incurred in connection with her business; but this contention is not sufficiently specific and is not supported by any evidence. The first requirement of § 707(b) is satisfied as to Ilagan. This Court will continue this motion as to Busayasakul to allow her to file admissible evidence in support of her contention that her debt arose out of her business.

### 3. *Substantial Abuse*

The second requirement of § 707(b) is that granting such relief would amount to a substantial abuse of the provisions of Chapter 7. In the Ninth Circuit, the primary test for substantial abuse is whether a debtor has the ability to repay his debts. *Kelly*, 841 F.2d at 914. In our Circuit, this fact alone is sufficient for a dismissal under § 707(b). *Id.* If the debtor is unable to repay the entire debt within three years, without undue hardship to the debtor or the debtor's dependents, it is appropriate to analyze other factors which indicate bad faith. "[I]nability to pay will [not] shield a debtor from section 707(b) dismissal where bad faith is otherwise shown." fn. 8 at 915.

The *Kelly* rule holds that a debtor's ability to pay his debts, standing alone, justifies dismissal under § 707(b).[10] However, while it is clear in the Ninth Circuit that a debtor's ability to pay his debts, in and of itself, is substantial abuse and, therefore, sufficient for a dismissal under § 707(b), the rule fails to provide courts with guidance as to what other factors should be considered when the debtor has little or no financial ability to fund a chapter 11 or chapter 13 plan. For that reason, it is helpful to examine tests used by other circuits when considering this precise issue. *In re Piontek*, 113 B.R. 17 (Bankr. D.Or.1990).[11]

Two approaches have developed in analyzing a motion under § 707(b) when evidence indicates the debtor has little or no ability to pay his debts: the "totality of the circumstances test" of the Fourth Circuit, *see In re Green*, 934 F.2d 568 (4th Cir.1991 ); and the "hybrid approach" of the Sixth Circuit, *see In re Krohn*, 886 F.2d 123 (6th Cir.1989).[12]

The "totality of the circumstances approach" rejects the proposition that solvency alone is sufficient to justify a finding of substantial abuse. *Green*, 934 F.2d at 572. Instead, courts adopting this analysis consider various circumstances contributing to bad faith, including: (1) whether the bankruptcy petition was filed as a result of a sudden illness, calamity, or unemployment; (2) whether the debtor obtained cash advances and made purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive and unreasonable; (4) whether the debtor's schedules and statement of current income and expenses are reasonably accurate; and (5) whether the petition was filed in good faith. *Id.* In other words, the Bankruptcy Code and its underlying legislative history:

> [provide] a strong indication that Section 707(b) was intended to explicitly recognize the court's ability to dismiss a Chapter 7 petition for lack of good faith—when the 'total picture is abusive.'

*Id., quoting Waites v. Braley*, 110 B.R. 211 (E.D.Va.1990).[13]

---

**10.** This test, used in the Eighth and Ninth Circuits, is commonly referred to as the "per se rule." *Kelly*, 841 F.2d at 914; *United States v. Harris*, 960 F.2d 74, 76 (8th Cir.1992).

**11.** It can be argued that this is dicta, as the debtor in *Kelly* had the ability to repay his creditors.

**12.** For additional analysis of these approaches, see *In re Carlton*, 211 B.R. 468, 475–76 (Bankr. W.D.N.Y.1997), and *In re Ontiveros*, 198 B.R. 284, 287–88 (C.D.Ill.1996).

**13.** As is the case in most reported opinions this Court; has reviewed, the debtor in *Green* had the ability to repay some or all of the creditors from future income. The Fourth Circuit did not find that solvency was the critical factor in deciding the motion to dismiss the chapter 7 case, but held that the bankruptcy court should determine on a case-by-case basis, from a "totality of the circumstances approach," whether the debtor is seeking to take unfair advantage of the creditors. Moreover, the court in *Green* specifically noted:

> The establishment of a future income threshold of eligibility for Chapter 7 by means of the per se rule we are urged to adopt would render [the presumption in favor of granting the relief requested by the debtor] toothless. . . . A debtor who has filed a Chapter 7 petition has elected to discharge his debts by liquidating his non-exempt assets. If the debtor, acting in good faith, preferred to effect the discharge by making extended payment to his creditors over time, presumably he would have filed under Chapter 13. The court may advise the latter, but the election remains with the debtor, a point underscored by Congress's explicit refusal to adopt a mandatory Chapter 13 provision.

*Green*, 934 F.2d at 572. The court continued to state that a per se rule dismissing Chapter 7 petitions if the debtor has the ability to substantially repay his creditors could only be effective if the debtor is also eligible for Chapter 13. *Id.*, at 572 n. 8.

The "hybrid approach" utilized by the Sixth Circuit analyzes "the ability of the debtor to repay creditors out of future earnings and then analyzes any mitigating factors which may then rebut the resulting presumption of substantial abuse." *Carlton*, 211 B.R. at 476, *citing In re Krohn*, 886 F.2d 123 (6th Cir.1989). Courts adopting this approach hold that "[s]ubstantial abuse can be predicated upon either lack of honesty or want of need." *Krohn*, 886 F.2d at 126 (6th Cir. 1989). In other words, the court must ascertain whether the debtor:

> is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is 'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets.

*Id.* Factors to be considered in determining whether a debtor is needy include the debtor's eligibility for chapter 13, state remedies to ease the debtor's financial burden, the availability of relief through private negotiations with the lenders and whether the debtor can significantly reduce expenses without being deprived of necessities. *Id.* at 126–127.

If the debtor is found needy, then the court is to look at other indicia of bad faith, such as whether the debtor filed accurate schedules and other documents with the court, whether there were eve-of-bankruptcy purchases, and whether the chapter 7 filing was due to unforeseen or catastrophic events. *Id.* at 126. But the court is also to dismiss the needy debtor's case "where an unscrupulous debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors [through an] ... unprincipled accumulation of consumer debt. [The debtor] will be held to at least a rudimentary standard of fair play and honest dealing." *Id.* As such, the facts of the case are evaluated to determine whether a debtor has been unprincipled or is not in need of a chapter 7 discharge.

In this case, the United States Trustee does not claim that the debtors are able to repay their debts. Instead, the United States Trustee argues that the debtors' credit-card abuse merits a finding of substantial abuse. According to the United States Trustee, the factors that are most relevant are whether the debtors made purchases in excess of their ability to repay and whether their petitions were filed in good faith.

The only published case found by this court where substantial abuse was found despite the debtor's inability to repay is *In re Uddin*, 196 B.R. 19 (Bankr.S.D.N.Y.1996). In that case, the debtor incurred over $170,-000 in unsecured debt, approximately $60,000 of which was due to purchases and large gambling losses. Accordingly, the court found that the debtor's financial distress stemmed directly from his excessive purchases and gambling debts. *Id.* at 23. Further, the debtor had also made misrepresentations—that he was earning income even though he was unemployed—in order to obtain to charge accounts. As such, the court in *Uddin* found that the debtor had engaged in a "blatant abuse of consumer credit." *Id.* at 24. The court then held that once an abuse of consumer credit has been established, dismissal is warranted if the "financial distress is directly related to purchases of luxury goods and accrual of gambling debts." *Id.* at 23. Chapter 7 relief is appropriate for debtors who are unfortunate and undisciplined, not for a debtor "attempting to lead the life of Riley while his creditors suffer on his behalf." *Id.; citing In re Bryant*, 47 B.R. 21, 26 (Bankr.W.D.N.C.1984).[14]

### 4. *Effect of Dismissal When Debtor Has the Inability to Pay*

If a case is dismissed under § 707(b) based on pre-petition acts of the debtor and the debtor has no present or future ability to

---

**14.** *Bryant* could have been dismissed under § 707(a), as the debtor failed to disclose assets and liabilities and selectively chose which creditors to discharge. Further, the debtor did not have appreciable assets. Nonetheless, the court found substantial abuse based on the debtor's picking and choosing which creditors to discharge and continuing to live an excessively luxurious lifestyle while not repaying his creditors (i.e. debtor spent $100 per month dining out and paid $65 a month for cable television).

make payments, it is equivalent to dismissal with prejudice or a denial of discharge. This occurs because the Debtors would be unable to repair their problems and refile their cases as the facts indicating bad faith (the existence of large amounts of pre-petition credit-card debt) cannot be changed by any later action of the debtors, nor do the debtors have the current income or future earning capacity to fund either a chapter 11 or chapter 13 case. In construing the Bankruptcy Code in its entirety, it is imperative to analyze under what type of circumstances discharge is denied in order to determine whether Congress intended the effective denial of discharge as a remedy to bad faith filing where debtor does not have the income to repay the consumer debt.[15]

There are three sections in the Bankruptcy Code which specifically provide for the denial of discharge to chapter 7 debtors. First, § 727 applies to actions by the debtor which interfere with the ability of the bankruptcy court to carry out the policies embodied in the Code, including permitting a discharge only to an honest debtor, ensuring a fair distribution to creditors in priority order and with equal distribution within the same class, requiring the submission of all of the debtor's non-exempt property to the jurisdiction of the court, and requiring full disclosure of all potential preferences and fraudulent transfers. 11 U.S.C. § 727 (1994). Second, § 523 prevents the discharge of certain debts based either on public policy (i.e. taxes, spousal and child support) or on inequitable prepetition conduct of the debtor in relationship to a particular creditor and claim. 11 U.S.C. § 523 (1994). Finally, § 349 allows dismissal with prejudice, which is a permanent bar to discharging the debts in existence at the time of the filing of the case. 11 U.S.C. § 349 (1994). As in § 727, the grounds for dismissal with prejudice must be an assault on the integrity of the bankruptcy system and must be egregious. *In re Leavitt,* 209 B.R. 935 (9th Cir. BAP 1997)

Nothing in § 707 or its legislative history indicates that a dismissal under § 707 is

meant to bar a debtor from refiling another chapter 7 case. 6 Collier on Bankruptcy ¶ 707.03[4]. If a case is dismissed for cause under § 707(a), the debtor may still have the opportunity to eradicate the problem, if possible, and refile at a later time. If a case is dismissed under § 707(b) on the basis that the debtor has the ability to repay the debts, the debtor can refile a case under chapter 11 or 13. If the Court finds that the § 707 acts of the debtor were so egregious that a discharge should be denied, the Court can so order under § 349.

Only the Court or the United States Trustee, as guardians of the bankruptcy system and not advocates of any particular creditor or group of creditors, is empowered to initiate a motion to dismiss under § 707(b). Since the effect of dismissing these cases under § 707(b) results in a complete denial of discharge identical to that under § 349 or § 727, it should not occur without a finding that the debtor acted to the detriment of the bankruptcy system.

### 5. *Credit Card Abuse and § 707(b)*

In adhering to the rationale behind the enactment of § 707(b) as well as upholding the underlying principles of our bankruptcy system, this Court holds that if a debtor possesses excess income so that the debtor is able to pay his debts, dismissal is warranted. However, if evidence suggests the debtor is unable to meet a meaningful part of his financial obligations, the court must consider other relevant indicia of the debtor's honesty and good faith and whether there are lesser effective remedies to protect the creditor-body and/or the bankruptcy system from the effects of debtor's bad faith dealings.

The substantial abuse to the system that is being prevented in cases involving credit-card abuse must be that § 523(a)(2) is not an effective remedy given the facts of the case. This is not meant as a bright-line test, but rather a case-by-case analysis as to when a motion might be granted. The issues to be considered by the court

---

**15.** *Massachusetts v. Morash,* 490 U.S. 107, 114, 109 S.Ct. 1668, 1672–73, 104 L.Ed.2d 98 (1989) (holding that a statute should be construed as a

whole); *In re Khan,* 172 B.R. 613, 624 (Bankr. D.Minn.1994).

are as follows: (1) whether the overwhelming percentage of the debtor's unsecured debt is due to credit cards; (2) whether the debtor has used so many credit cards that it would multiply the workload of the court to adjudicate each § 523(a)(2) action separately; (3) whether there is no economic incentive to individual creditors to bring an action under § 523(a)(2) to have their debt declared non-dischargeable [16]; (4) whether the credit-card debt was obtained for luxury goods, high lifestyle or other improper purposes; and (5) whether the debtor has failed to make an honest effort to repay these obligations before filing bankruptcy. If the court finds that these facts are proven, then grounds exist to dismiss the case under § 707(b) even if the debtors lack the ability to make present or future payments.

### 6. *Presumption in Favor of the Debtor*

Section 707(b) expressly provides for a presumption in favor of granting a discharge to a chapter 7 debtor. According to the Ninth Circuit, this presumption acts as a reminder of the policy favoring granting bankruptcy relief. *Kelly*, 841 F.2d at 917. In other words, the "presumption is an indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present." *Id., citing* 6 Collier ¶ 707.04[5][a]. *Kelly* enunciated the standard in the context of due process concerns about a bankruptcy court's ability to *sua sponte* bring a motion to dismiss under § 707(b). Therefore, Kelly did not explicitly discuss the relationship between the presumption and the substantial abuse standard.

When the debtor has the ability to repay debts, the presumption is rebutted and a dismissal under § 707(b) is appropriate. *Walton*, 866 F.2d at 985; *Ontiveros*, 198 B.R. at 290. If the debtor does not have the ability to repay, the presence of other factors indicating dishonesty or lack of need will overcome the presumption. *Carlton*, 211 B.R. 468, 477–478; *Krohn*, 886 F.2d at 128. However, the factors must clearly demonstrate a substantial abuse in order to overcome the presumption in favor of the debtor. *Kelly*, 841 F.2d at 917.

### IV. CONCLUSION

The § 707(b) motion as to Motaharnia is denied as untimely. The § 707(b) motion as to Busayasakul is continued for further hearing on why and when the debts were incurred, whether they originated as consumer debts, and what efforts the debtor made to repay the debt prepetition. The Ilagans have failed to respond to this motion, which may be because they filed their own motion to withdraw the petition (which was never ruled on by the Court as the Ilagans did not follow the required procedures). It appears that the United States Trustee met the burden set forth above as to the Ilagans. However the Court deems the Ilagans' "Withdrawal of Voluntary Petition" to be a motion to dismiss and dismisses under that motion, thus mooting this motion by the United States Trustee.

---

**16.** For example, whether the amounts owed on each credit card are relatively small or the credi-

tors would have little hope of collection on a judgment during the coming 10 years.